IRENE KRENIK v. HENRY H. WESTERMAN.[1]

November 12, 1937.

No. 31,412.

*Oppenheimer, Dickson, Hodgson, Brown & Donnelly* and *Smith & Coughlin,* for appellant.

*Moonan & Moonan* and *H. G. Dressel,* for respondent.

LORING, JUSTICE.

In a suit to recover for personal injuries the plaintiff had a verdict for $21,517.25, and the defendant has appealed from an order denying his motion for judgment notwithstanding the verdict or new trial.

The record presents a question of fact for the consideration of the jury as to defendant's negligence; and, in view of the disposition we make of the case, it becomes unnecessary to consider the contention that the verdict is excessive.

The principal question presented by the appeal is whether or not the argument of plaintiff's counsel to the jury was so improper and prejudicial to the defendant as to necessitate a new trial.

[1]Reported in 275 N. W. 849.

The case was unusually close on the question of the defendant's negligence, principally because of the weight of the impeaching evidence produced by him. At the time of the accident the plaintiff was a single woman about 35 years of age, residing at Montgomery, Minnesota, by occupation a stenographer, secretary, and bookkeeper. The defendant was at the time of the accident president and treasurer of the Westerman Lumber Company of Montgomery, for which the plaintiff had been working more or less continually from July, 1935, to January 23, 1936. February 3, 1936, the plaintiff accompanied the defendant, who was going by automobile to Minneapolis, on business. The driving conditions were bad owing to wind and flying snow. At a point about four and a half miles north of Montgomery, the defendant was driving behind a truck which created a considerable cloud of snow in its wake. The plaintiff and defendant agree that at this point the defendant said that he thought he would drop back a little farther behind the truck. From this point on there is a radical difference between the testimony of the plaintiff at the trial and her statements made on two occasions after the accident. Those statements are in full accord with defendant's testimony. The defendant claims that while he was driving on his own side of the road a car driven by W. L. Lambertson, an employe of the Investors Syndicate, Minneapolis, suddenly appeared out of the snow cloud and collided with the defendant's car, head on, causing the injuries of which plaintiff complains. On the other hand, the plaintiff testified at the trial that after defendant had made the remark that he would fall back a little from the truck, instead of doing so he increased his speed and swung to the left in an apparent attempt to pass the truck, and there collided with the Lambertson car. At the trial Lambertson testified that as he met the truck and entered the cloud of snow the defendant's car, with its lights on, suddenly appeared to be swinging into the left front end of his car, which he claims was on his own right-hand side of the road. The second day after the accident he was interviewed by an attorney for the Anchor Casualty Company, accompanied by a stenographic reporter, and to the question: "I wonder if you would explain to me, Mr. Lambertson,

how this accident occurred," said, "I can't tell you any more about it than there was just a cloud of snow come up after this truck passed me, a cloud of snow come up, and that's all I know." He was asked: "You don't recall seeing this car of Mr. Westerman's," and he replied: "No, I didn't see him at all, could not see him, of course he was right back of that truck." The testimony with reference to the position of the cars after the collision was not very helpful to either side.

February 18, with the permission of the superintendent of nurses and of the doctor in charge of the plaintiff, the attorney for the Anchor Casualty Company, accompanied by a stenographic reporter, interviewed the plaintiff at Eitel Hospital, where she had been taken for an operation upon her nose and frontal sinuses, those parts being the principal ones injured in the collision. This interview was taken down in shorthand. She said specifically:

"We were on our right, so was the truck, right nicely on our right. * * * We were where I imagined the driver should really be, * * * if he drove intelligently where he should really be, and so was the truck." * * *

Q. "You didn't see the car come between you and the truck?

A. "Never saw it until it was right smack there. * * *

Q. "And this car was right between you and the truck?

A. "Yes.

Q. "On your side of the road?

A. "Yes, because we were on our right and he was right there.

Q. "He was on the wrong side of the road, his wrong side of the road?

A. "Yes, of course. I don't remember a thing about it, I could not say now—well, just that he was right with us, that's all that I know."

Upon the trial she stated that at the time she gave this interview she was under the influence of opiates and did not remember what she had said. There was no contention that the statement was fraudulent in the sense that the answers that she actually gave were not taken down or the statement was not a true record of the inter-

view. All answers other than on the question of which side of the road defendant was on were admittedly correct. Her claim that she was under the influence of opiates on February 18 is contradicted by the hospital records. A month later, on the 19th of March, she was interviewed by a representative of the Employers Mutual Liability Company, the compensation insurer of. the Westerman Lumber Company, and she admitted that she made a statement as follows:

"We were going north, between 20 and 25 miles an hour. We were following a large truck for a distance of about 800 to 1,000 feet. We were driving on our side of the road. It was snowing very hard and also blowing. The truck was kicking up a lot of snow. I don't know if we had our lights on. The road is a tarvia road. It has a yellow line marking the center. I saw the line just before the accident. We were upon our side of the road. A car came from the other direction, north, going south, and meeting the truck. * * * The cars met head on, on our side of the road."

The statement of March 19 was read and signed by her, but that of February 18 was apparently transcribed elsewhere and not signed by her. In this state of the record it will be seen that the question of fact on defendant's negligence was an extremely close one and naturally depended largely on the weight to be given by the jury to the plaintiff's statements. Defendant's counsel in his argument to the jury emphasized the weight to be given them, but we find nothing in his closing remarks or in the record which justifies a contention that they were fraudulent in any way, or that the manner of taking was reprehensible, or to justify the following remarks made by plaintiff's counsel to the jury:

"Oh, members of the jury, they can drive a knife blade through the heart of that girl by trying to claim she lied in this courtroom, but I say to you that girl has gone through a real death since February 3, 1936, and when they stand before a jury of Le Sueur county and try to minimize this girl's character and standing by a statement taken by paid men, paid by the insurance company, employed by the insurance company, because I say the time has come

for you in Le Sueur county to stand up and act and write your disapproval of that by writing a verdict that will adequately and only fairly pay to Irene Krenik for the pain, the shame, the humiliation that she has suffered, that will adequately pay her going down the rest of the way of her life, her life completely destroyed as a girl's life always is when something as terrible as this happens to it."

The closing argument of plaintiff's counsel is permeated with the contention that there was something reprehensible on defendant's part about the taking of these statements from the plaintiff, and the interview of Lambertson. Defendant's counsel prior to the charging of the jury took exceptions to the quoted remarks as well as to other phases of the plaintiff's argument relating to the fact that defendant was insured. The court charged the jury to disregard his argument about the taking of the statements but not about the insurance. The court did not specifically negative the implication that defendant should be punished for taking the statements. Perhaps what plaintiff's counsel said about insurance was invited by what occurred at the trial, although we think it was overemphasized. We are of the opinion, however, that the vice of such an appeal to prejudice and for a verdict that should in a measure punish the defendant for contending that these statements were true was something that the court could not cure. We regret that clients must suffer for the overzealousness of counsel, but if the courts are to retain the respect of the people they must restrain counsel from going beyond the limits of fair argument. In a democracy like ours the impartial administration of justice is essential to the preservation of liberty. That is pretty well understood as applied to judges. All realize that a prejudiced judge is a reproach to the judicial branch of the government. If we are to have fair and impartial decisions, the emotions must not play a part in arriving at them. Emotion must not dominate or supersede reason. If it does, partiality results, and partiality in any branch of the government is but tyranny. The proper discharge of the functions of a jury is as essential to impartial justice as is the impartiality of the judge. Emotions and prejudices insofar as they are

aroused in the jury poison what should be the clear and wholesome stream whose waters quench the thirst of the seeker for impartial justice. Too often if justice is not thought to be impartial foul means are resorted to. Hence it is vital to our welfare that general respect for the fairness of juries as well as of judges be maintained. It cannot be if juries are to be swayed by improper appeals to prejudice and emotion, and that by officers of the court. We need not repeat what was said in Prescott v. Swanson, 197 Minn. 325, 267 N. W. 251, or in Swanson v. Swanson, 196 Minn. 298, 265 N. W. 39. In the latter case, as here, the trial court attempted to correct the misconduct, but we held that the prejudicial remarks went beyond what it was possible to correct and granted a new trial. Here there was an even more flagrant appeal, and we must grant a new trial.

Reversed.

PETERSON, JUSTICE (dissenting).

Defendant's contention is that plaintiff's counsel should not have made statements from which it might be inferred that there were some things about the taking of the statements which were reprehensible. But all of this was provoked by the remarks of defendant's counsel, covering several pages of the record, that the taking of the statements was entirely proper and that it was misconduct for plaintiff's counsel to contend to the contrary. Illustrative remarks of defendant's counsel are:

Mr. Donnelly: "I think I have a right to read this in my argument to the jury, the Swanson case, Swanson v. Swanson, 265 Northwestern 39, at page 41.

The Court: "Did you see it?

Mr. Moonan: "I did. I think it's proper subject for argument, but it is not proper for counsel to read a part of the opinions of some court.

The Court: "The fact it is bound in a lawbook binding doesn't make it objectionable.

Mr. Moonan: "Very well. Note an exception.

Mr. Donnelly (reading): " 'Diligence in performance of duty frequently required that a lawyer charged with either the prosecu-

tion or defence of a case of this kind procure statements from prospective witnesses as promptly as may be. They are not to be criticized for so doing. They would be subject to criticism for doing otherwise. There is about the memory of some witnesses a kaleidoscopic and manipulable quality against which it is often impossible to take enough precaution. If the work is honestly done, it deserves nothing but commendation. We cannot condone tacitly or otherwise the action of counsel, who, after it appears that the statement of a witness has been taken with fairness, persistently endeavors to make a jury believe that there is yet something reprehensible clinging to it. Such procedure is misconduct.' That's what our supreme court of the state of Minnesota has said. So, please, ladies and gentlemen, do not be misled by any grave suggestions that have been made or may be made implying that the taking of statements of witnesses in cases of this kind is dishonest or wrongdoing. As in that case the difficulty of taking enough precaution has already. been clearly shown in this case, I am sorry to say."

The case referred to by counsel is Swanson v. Swanson, reported in 196 Minn. 298, 265 N. W. 39. The part of the argument of plaintiff's counsel which it is now claimed was improper was in answer to the arguments of defendant's counsel that the taking of the statements was proper and not fraudulent.

Defendant is not entitled to assign error with respect to the argument of plaintiff's counsel because the entire matter could have been avoided by defendant's making a timely request for an instruction to eliminate from the consideration of the jury the issue of fraud in the taking of the statements. By 2 Mason Minn. St. 1927, § 9298, counsel was entitled to request instructions, have a ruling of the court allowing or disallowing them before the arguments to the jury, and read to the jury the instructions given as part of his argument. Defendant was entitled to the instruction eliminating the question of fraud under the rule of the very case of Swanson v. Swanson, 196 Minn. 298, 265 N. W. 39, from which he read, which instruction the court later gave, after the 'arguments, upon the authority of that case. But defendant's counsel was not satisfied

with the benefits of the statute alone. The statute did not serve his purpose. He took benefits which the statute did not give him. He argued the question of fraud to the jury to get whatever advantage he could by reading from Swanson v. Swanson, which he could not do if he had abided by the statute. Then, when plaintiff's counsel replied to his argument, he requested the court to instruct the jury that there was no issue of fraud in the case and to disregard the remarks of plaintiff's counsel. In other words, he wanted to be in the position of having discussed the matter thoroughly from his point of view and have an instruction from the court ruling out any similar discussion on the part of plaintiff and taking the entire issue from the jury.

It is well stated in 3 Am. Jur. § 246, p. 27, *et seq.*:

"Obviously, the ends of justice are served by the avoidance of the delay and expense incident to appeals, reversals, and new trials upon grounds of objection which might have been obviated or corrected in the trial court if the question had been raised. * * * Where a party has the option to object or not, as he sees fit, the failure to exercise the option when the opportunity therefor presents itself must, in fairness to the court and to the adverse party, be held either to constitute a waiver of the right to object, or to raise an estoppel against the subsequent exercise thereof."

We applied the rule in McCarvel v. Phenix Ins. Co. 64 Minn. 193, 66 N. W. 367, in which we held that failure to request an instruction which would have obviated error precluded a party from assigning the error upon appeal. In principle it is somewhat akin to the doctrine of invited error, which precludes a party from asserting error on appeal which he invited or could have prevented in the court below. An appellate court will not permit a party to place himself in a position where, if the verdict is satisfactory, he can abide by it; but, if it is against him, he may avoid it. 1 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 419; Bennett v. Syndicate Ins. Co. 43 Minn. 45, 44 N. W. 794; Crane v. Veley, 149 Minn. 84, 182 N. W. 915. The thought is stated in Townsend v. Jemison, 7 How. (U. S.) 706, 721, 12 L. ed. 880: "Nor does it promote the

ends of justice to let parties lie by and not take exceptions, and afterwards reverse judgments for omissions, which, if noticed at the time, would have been corrected." But, instead of taking the ruling to which he was entitled by law, defendant's counsel elected, for the time being at least, as he thought, to take the issue to the jury. There was much evidence aside from the fraud in their taking, affecting the weight of the statements. We can only surmise that his reason for arguing the matter first to the jury, instead of to the court, was to get before the jury the language used by us in the Swanson case, quoted above, to applaud and praise the defense in language of this court laid down as an abstract proposition, not intended for defendant or to apply to its particular conduct, but which defendant's counsel cleverly would have had the jury believe was intended for his client and his agents. It is hardly necessary to say that defendant's counsel himself was guilty of misconduct. In Steffenson v. C. M. & St. P. Ry. Co. 48 Minn. 285, 51 N. W. 610, we held that reading from lawbooks to the jury by counsel is a dangerous practice and should not be indulged in. Plaintiff was entitled to have the jury receive the law directly from the judge presiding in the court below and not from defendant's counsel. Abbott, Civil Jury Trials (5 ed.) § 352, p. 770, note 18.

After the arguments the court granted defendant's requested instruction, which was in the language and form prepared by him and in which the court charged the jury that there was no fraud in the taking of the statements and directed it to disregard the statements and arguments of plaintiff's counsel upon which error is now predicated. The instruction embraced substantially the language which counsel had quoted from Swanson v. Swanson, *supra*. The court took great pains in other parts of the charge to instruct the jury to lay aside all passion, prejudice, and sympathy and calmly to consider the entire case. And in its last admonition to the jury it again singled out the argument of plaintiff's counsel and again admonished the jury not to be unduly influenced by it.

To reverse is to permit defendant to profit by his own wrong. He should have requested the instruction at the proper time and should not have injected the issue into the case. After having pro-

voked counsel and engaged in such arguments, he should not be permitted, after an adverse verdict, to take advantage of the situation which he himself has created. One should not be permitted to lie in wait, to use the language in Townsend v. Jemison, 7 How. (U. S.) 706, 12 L. ed. 880, nor to ambush his opponent. See Dehen v. Berning, 198 Minn. 522, 528, 270 N. W. 602. It offends against all principles of justice and fairness.

■ The remarks of plaintiff's counsel in themselves are not prejudicial. They amounted to no more than an appeal to the jury to do its duty, to do justice. They requested only compensatory damages. Such remarks are not prejudicial. Smith v. G. N. Ry. Co. 133 Minn. 192, 158 N. W. 46, in which counsel requested the jury to award his client "big money." Nor were the remarks on the interest of the insurance company in this defense erroneous. Counsel for defendant concedes that the conduct of the company was introduced as an issue by himself and a subject of legitimate comment but says that plaintiff's counsel went too far. The mere fact that the remarks related to an insurance company does not preclude counsel from making any proper discussion of the conduct involved. State v. Ettenberg, 145 Minn. 39, 176 N. W. 171. Counsel may call things by their true name when the record supports it. Kassmir v. Prudential Ins. Co. 191 Minn. 340, 254 N. W. 446. If the remarks were as prejudicial as counsel now claims, it seems that he would have moved the court for a mistrial. Instead, he asked the court for an instruction which he then thought was adequate to deal with the situation. That aside, the court below, who was in a better position than we are to determine the effect of the remarks, deemed the instructions adequate to overcome the prejudice, if any, of the remarks. We should remember though that juries are possessed of much common sense. As stated in 4 C. J. 958:

"The reason for this rule has been very clearly stated in a recent decision as follows: 'It is the presumption of law that jurors are intelligent, honest, fearless and just. Courts are not justified in assuming that the mind of the jury is of such plastic and unreliable material as to at any unjustified word of debate neglect the instruc-

tions, abandon the evidence and disregard their oaths.' " Devine v. Chicago City Ry. Co. 167 Ill. App. 361, 364. See Smith v. G. N. Ry. Co. 133 Minn. 192, 158 N. W. 46.

■ Defendant cannot complain. He received the instructions and the relief which he requested. He was not entitled to anything more. Curran v. C. G. W. R. Co. 134 Minn. 392, 159 N. W. 955; see Bank of Dakota County v. Garvin, 167 Minn. 101, 208 N. W. 642. If counsel did not get more it was because he did not ask for more. Adequate correction was made by the instructions. In Tri-State Transfer Co. v. Nowotny, 198 Minn. 537, 270 N. W. 684, we held that a somewhat similar argument by defendant's counsel in this case, attacking a statement, was cured by an instruction that the taking of the statement was not fraudulent and that it was proper.

■ The duty to prevent improper influences from trials is one resting upon "both lawyers and courts." Prescott v. Swanson, 197 Minn. 325, 337, 267 N. W. 251, 257. The duty is upon defendant's as well as plaintiff's counsel. If counsel had discharged the duty in this case he would not be here asserting error. Precepts are useless unless they are observed. We will not get coöperation between court and counsel by permitting counsel to pursue the course which was adopted in this case, and lay up error to be asserted later by them. This is to make a lawsuit a game of chance.

In my judgment, the court below made the right disposition of this case. There should be an affirmance.

Mr. Chief Justice Gallagher took no part in the consideration or decision of this case.